## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALIFAX HOLDING SPA<br>Via Petrarca, 2/1<br>35020 Polverara (PD)<br>Italy<br><br>          Plaintiff,<br><br>     vs.<br><br>ALCOR SCIENTIFIC INC.<br>20 Thurber Boulevard<br>Smithfield, RI 02917<br><br>and<br><br>FRANCESCO A. FRAPPA<br>Via San Vidotto n. 23<br>Camino al Tagliamento (UD)<br>Italy<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 14-440<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Alifax Holding SpA ("Alifax"), by and through its attorneys, for its Complaint against Alcor Scientific Inc. and Francesco A. Frappa (collectively, the "Defendants") states as follows:

### NATURE OF THE ACTION

1.     This action arises out of Defendant Frappa's unauthorized removal and misappropriation of Alifax's proprietary, confidential and trade secret information in connection with his resignation from Alifax to join Defendant Alcor, and the use by Frappa and Defendant Alcor of that information in the production and sale of clinical diagnostic instrumentation in

{W4523633.1}

competition with Alifax. This action also arises out of Alcor's infringement of two of Alifax's patents by its production and sale of this instrumentation.

2. Alifax develops, produces and sells clinical diagnostic instrumentation. One of its most important products is instrumentation for the determination of the erythrocyte sedimentation rate (ESR) in human blood. Its ESR analyzers are the industry standard. Based on patented technology, they automatically test for inflammation in blood and produce reliable results in 20 seconds. They represent a substantial improvement over traditional ESR analyzers, which take an hour to produce results. Until Defendant Frappa left Alifax and joined Defendant Alcor, no other company in the world made an ESR analyzer that could compete with the Alifax analyzers.

3. Defendant Frappa was employed at SIRE Analytical Systems Srl, a subsidiary company of Alifax group, from 2002 to 2011. During that time, he was intimately involved in the design and development of Alifax's ESR analyzers. In this capacity, he was provided access to Alifax's proprietary, confidential and trade secret information. As an employee of Sire-Alifax involved in the company's research and development, Frappa owed a duty to maintain the confidentiality of Alifax's proprietary, confidential and trade secret information.

4. Frappa resigned from Sire-Alifax, effective September 1, 2011. On information and belief, immediately thereafter he joined Defendant Alcor as director of research and development.

5. On information and belief, prior to Frappa's joining Alcor, Alcor had never developed or produced an ESR analyzer. Within one year after Frappa joined Alcor, it developed and introduced in the market an ESR analyzer that analyzes blood samples and produces results in 20 seconds, just like Alifax's ESR analyzers. Suddenly, after never having

made an ESR analyzer before, Alcor is now in direct competition with Alifax in the sale of these instruments and is selling the only other ESR analyzer in the world with the capabilities of Alifax's patented analyzers.

6. The Alcor ESR analyzer incorporates technology that infringes patents owned by Alifax. Frappa and Alcor used Alifax's proprietary, confidential and trade secret information in the design and production of Alcor's ESR analyzer, and this enabled Alcor to design and produce an instrument that it otherwise would not have able to design and produce, or that would have taken it much longer to design and produce than it did.

7. Alifax brings this action to protect its patent rights, trade secrets and confidential information and to seek redress from the harm that Defendants' wrongful conduct have caused and will cause Alifax. Alifax seeks an injunction and an award of damages against Alcor for patent infringement and misappropriation of trade secrets, and an injunction against misappropriation of trade secrets and confidential information by Frappa.

## THE PARTIES

8. Alifax is an Italian corporation with its principal place of business in Padua, Italy, and Sire is its plant for production, research and development in Nimis (Udine), Italy. It sells its products in more than ninety countries around the world, including the United States.

9. Frappa worked for Alifax in its Sire plant in Nimis, Italy. Alifax is informed and believes that Frappa is now employed by Alcor and resides in Italy.

10. On information and belief, Alcor is a Rhode Island corporation with its principal place of business in Smithfield, Rhode Island.

## JURISDICTION AND VENUE

11. This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

12. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the nonpatent claims because they are so related to the patent claims that they form part of the same case or controversy under Article III of the United States Constitution.

13. This Court has personal jurisdiction over Defendant Alcor because it maintains its principal place of business in Smithfield, Rhode Island.

14. This Court has personal jurisdiction over Defendant Frappa under G.L. 1956 § 9-5-33(a).

15. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Rhode Island.

16. Venue is proper in this Court under 28 U.S.C. § 1400 because defendant Alcor maintains its principal place of business in Rhode Island.

## FACTUAL ALLEGATIONS

### Alifax's Business, Trade Secret and Confidential Information and Patents

17. Alifax specializes in the development, production and sale of automated clinical diagnostic instrumentation for the determination of the ESR and bacterial culture in human biological liquids. It has obtained many patents worldwide in the fields of hematology and bacteriology. Alifax sells its products to customers around the world, including in the United States.

18.  Alifax is strongly focused on scientific research and technology innovation. In 1998, it acquired Sire Analytical Systems Srl, a company located in Nimis, Italy, near the city of Udine. Sire is Alifax's center for production and research and development. It operates in the field of in vitro diagnostic devices. Among its products are ESR analyzers.

19.  An ESR analyzer is a device used to test the rate of erythrocyte sedimentation in the blood in order to diagnose a clinical process of inflammation. It is among the most common diagnostic tests. The test is performed by measuring the speed of sedimentation of the blood sample; a higher rate of sedimentation than normal indicates the presence of inflammation. Before the invention of Sire's ESR analyzer, ESR tests relied on gravity for the sedimentation and the test took approximately an hour. With Sire's ESR analyzer, the time necessary for the test was reduced to 20 seconds.

20.  On October 14, 2003, the United States Patent and Trademark Office awarded U.S. Patent No. 6,632,679 (the "'679 patent"), titled *Method to Determine the Speed of Sedimentation of Blood and Other Parameters Correlated Thereto, and Relative Apparatus*, to Enzo Breda. Mr. Breda assigned the '679 patent to Sire. The '679 patent is now owned by Alifax. A complete and authentic copy of the '679 patent is attached as Exhibit. A.

21.  On February 28, 2006, the United States Patent and Trademark Office awarded U.S. Patent No. 7,005,107 (the "'107 patent"), titled *Apparatus for Determining the Speed of Sedimentation of Blood and Other Parameters Correlated Thereto,* to Enzo Breda. Mr. Breda assigned the '107 patent to Sire. The '107 patent is now owned by Alifax. A complete and authentic copy of the '107 patent is attached as Exhibit B.

22.  Frappa was hired by Sire on October 7, 2002 as an entry-level employee. In 2004, he joined the company's software development group. He then became responsible for

firmware development. After that, he was placed in charge of electronic and software planning. In 2008, he became the assistant director of research and development of the company. He held that position until he left the company. During his employment with Alifax Group, Frappa received compensation in the form of salary, bonuses and benefits.

23. During his employment with Alifax, Frappa was intimately involved in the design and development of the company's ESR analyzers. In this connection, he was provided access to all of the company's proprietary, confidential and trade secret information relating to its ESR analyzers.

24. One of the aspects of ESR analyzers in which Frappa was intimately involved was the development of a plastic capillary photometer sensor. The capillary photometer sensor, or "CPS," is the part of an ESR analyzer in which optical images are taken for measurement of the sedimentation rate of the blood sample. The blood flows through the capillary tube in the analyzer and, once inside the CPS, is stopped suddenly and subjected to optical measurements of the sedimentation rate. It was noted by company employees that the results of these measurements were subject to some variability; the same sample might produce somewhat different results when measured in different tests or in different machines. The company set out to address this problem. Frappa was placed in charge of this project, which was code named "Mecca."

25. In studying the problem, the company determined that the variability of results was due to the Teflon capillary tube, which was obtained by extrusion and did not guarantee a constant centering of the internal passage, through which the blood sample flowed. The result of the "Mecca" project was a new invention. Inside the CPS, the Teflon capillary tube was replaced by a plastic channel obtained by piercing or milling, thus providing consistent results and

improvement in reading the sample. In addition, in order to avoid interference from ambient lighting, the company built the CPS as a block of dark material with a transparent area inside, through which light emitted by a light source could pass and in which a hole was made to allow passage of the blood sample to be analyzed.

26. Frappa remained in charge of the "Mecca" project until he left Alifax. As such, he was intimately involved in all aspects of the project, including the research, design, and development of the resulting plastic CPS.

27. On October 11, 2011, after he had given notice of his resignation but while he was still employed by Alifax, Frappa wrote a report on the status of the "Mecca" project.

28. When Frappa left Alifax, the "Mecca" project was briefly suspended. It was then re-started and completed. Alifax then set about incorporating the plastic CPS into its various ESR analyzers.

29. Alifax has since filed applications for patents on its plastic CPS. Int. App. No. PCT/IB2013/001565. However, at the time of its development and at the time Frappa left the company, it was confidential information.

30. Another aspect of an ESR analyzer is the method by which the red blood cells are disaggregated, that is, separated from the condition of stacking or aggregation, in order to then measure the rate of re-aggregation. In approximately 2008, Dr. Galiano, Chief Executive Officer of Alifax, conceived the idea of using ultrasound waves to disrupt and redistribute the red blood cells for the purpose of then measuring the rate of sedimentation and other characteristics. He conveyed this idea to selected employees at Alifax, including Frappa. The idea was kept secret.

31. Alifax has invested substantial money to create proprietary designs, solutions, initiatives and equipment to ensure that Alifax provides cutting edge technologies and services to

its customers. One important aspect of these efforts was the "Mecca" plastic CPS for Alifax's ESR analyzers.

32. As an employee of Alifax, Frappa had an obligation to maintain the confidentiality of information learned in the course of his employment.

33. Frappa joined Sire immediately after he completed his education. All of the information learned by him concerning ESR analyzers up to the time he left the company was learned in the course of his employment at Sire-Alifax.

34. Research and development of new or improved products and ideas, such as the "Mecca" project or using ultrasound generators to disrupt and redistribute red blood cells, is by its nature confidential and was understood by Alifax employees to be confidential information not to be shared outside the company. In the hands of competitors or potential competitors, this information could be used to Alifax's harm.

35. Alifax's business information, including its confidential, proprietary and trade secret information, are of paramount importance to its business reputation and success. The "Mecca" project resulted in a new part (the plastic CPS) for the company's ESR analyzer. The plastic CPS significantly improved the reliability and consistency of the results of the company's ESR analyzers and therefore gave a further, important competitive advantage over Alifax's competitors or potential competitors.

36. Alifax has taken reasonable steps to protect the confidentiality of its proprietary, confidential and trade secret information.

37. Internal Alifax company communications, such as email messages and product drawings, stipulated that the information contained in them was confidential company information.

Misappropriation of Alifax's Business, Trade Secret and Confidential Information

38. On August 30, 2011, Frappa gave notice to Alifax that he was resigning from the company, effective September 1, 2011, promising to continue his work at the company for the full two months from the date of notice as provided in his employment contract.

39. Nevertheless, on September 26, 2011, Frappa notified the company that he had taken on another commitment and that this new commitment prevented him from rendering services to Alifax.

40. Alifax later learned that Frappa had accepted the position of director of research and development at Alcor.

41. Alifax is informed and believes and therefore alleges that, prior to its employment of Frappa, Alcor had never developed or produced an ESR analyzer.

42. Alifax is informed and believes and therefore alleges that, in late 2012, within a year of Frappa's resignation from Alifax, Alcor introduced an ESR analyzer for sale in the United States. It called it the "iSED."

43. Alcor advertises its "iSED" ESR analyzer, including at the Congress AACC in Houston, Texas, in the period July 30, 2013 to August 1, 2013 through its distributor, Arkray, as providing blood test results in 20 seconds. Alifax is informed and believes, and on that basis alleges, that no other ESR analyzer on the market today, except those sold by Alifax and Alcor, is capable of producing results in anything close to 20 seconds.

44. Alifax believes and therefore alleges that Alcor could not have produced the "iSED" analyzer without the benefit of information provided to it by Frappa, all of which he learned during his employment at Alifax. Some of this information was proprietary, confidential and trade secret information belonging to Alifax. Among this information was proprietary,

confidential and trade secret information concerning the plastic CPS developed in Alifax's "Mecca" project.

45. On January 13, 2013, Alcor filed an application for U.S. patent. Appl. No. 13/740,843. It claimed a new system for determining the aggregation rate of red blood cells "using optical systems after or during inductive forces for red blood cell disruption and redistribution generated by ultrasound waves." On February 11, 2014, the United States Patent and Trademark Office issued U.S. Patent No. 8,647,886 (the "'886 patent"), titled *Apparatus, Method, System for the Determination of the Aggregation Rate of Red Blood Cells*. The inventors listed include Francesco Frappa. The assignee is listed as Alcor.

46. The concept of using ultrasound waves described in the specification of U.S. Patent No. 8,647,886 is exactly that conceived and discussed at Alifax, in the presence of Frappa. Alifax believes that the concept was communicated by Frappa to Alcor.

47. Alcor's "iSED" analyzer competes directly with Alifax's ESR analyzers. Alcor has sold the "iSED" to customers who had previously purchased ESR analyzers from Alifax. These sales for Alcor constitute lost sales for Alifax, which has suffered lost income and lost customers, including in the U.S. market, as a result.

48. ESR analyzers have been and remain a key component of Alifax's business, and were a focus of Frappa's duties and responsibilities while he was employed as assistant director of research and development at Alifax.

49. On March 7, 2014, Alifax, through counsel, sent a cease and desist letter to Alcor, demanding that Alcor stop manufacturing, selling and offering for sale its ISED analyzer.

50. On March 28, 2014, Alcor, through counsel, refused Alifax's demand.

51. Frappa's and Alcor's actions are a serious threat to Alifax's business, are in violation of applicable law, and unjustly enrich Frappa and Alcor. Injunctive relief is necessary to remedy the harm.

52. Alifax has no adequate remedy at law to fully protect it.

FIRST CAUSE OF ACTION

(Patent Infringement against Alcor)

53. Alifax hereby incorporates by reference and realleges each of the allegations contained in the foregoing paragraphs 1 through 52, inclusive, as though fully set forth in this cause of action.

54. On information and belief, Alcor has had notice of the '679 and '107 patents at least since Frappa joined Alcor in 2011 or 2012.

55. Alcor manufactures, offers to sell, sells and distributes iSED analyzers. These analyzers practice the claimed invention of the '679 and '107 patents.

56. Alcor has infringed and continues to infringe one or more claims of the '679 and '107 patents under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by making, using, selling and/or offering for sale in the United States, products encompassed in at least claim 1 of the '679 patent and claim 1 of the '107 patent, namely the iSED analyzer.

57. The infringement by Alcor of the '679 and '107 patents injured and continues to injury Alifax and will cause irreparable injury and damage to Alifax unless the Court enjoins Alifax from infringing the '679 and '107 patents.

58. Alifax's conduct in infringing the '679 and '107 patents renders this case exceptional within the meaning of 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION

(Misappropriation of Trade Secrets against Alcor and Frappa)

59.     Alifax hereby incorporates by reference and realleges each of the allegations contained in the foregoing paragraphs 1 through 52, inclusive, as though fully set forth in this cause of action.

60.     At all relevant times, Alifax was in possession of trade secret information as defined by Rhode Island's Uniform Trade Secrets Act ("RIUTSA"), R.I. Gen. Laws § 6.41.1 *et seq*.). As described above, Frappa was provided access to such trade secrets in his positions at Alifax.  The proprietary business and customer information of Alifax that Frappa was provided access to constitutes trade secrets because it is information, including a device, method, technique, or process, that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and because it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Alifax's trade secret information described herein is not and was not generally known to other producers in the industry.

61.     Alifax is informed and believes and therefore alleges that Frappa and Alcor have actually misappropriated and continue to threaten to misappropriate Alifax's trade secrets in violation of RIUTSA.

62.     Frappa disclosed trade secret information described above to Alcor having acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

63. Alcor acquired trade secret information described above from Frappa while knowing or having reason to know that the information was acquired by Frappa by improper means.

64. Alcor and Frappa intend improperly to use or disclose Alifax's trade secrets to others in violation of the RIUTSA.

65. Alcor and Frappa will continue wrongfully to use Alifax's trade secrets unless enjoined.

66. As a proximate result of Alcor's and Frappa's misappropriation and threatened misappropriation of Alifax's trade secrets, Alifax has suffered, and will continue to suffer, damages in an amount to be proved at the time of trial, but which are substantial and in excess of the minimum jurisdictional amount of this Court.

67. Alifax's remedy at law is inadequate, and therefore Alifax seeks permanent injunctive relief.  Alifax is threatened with losing customers, technology, its competitive advantage, its trade secrets and good will in amounts which may be impossible to determine, unless Alcor and Frappa are enjoined and restrained by order of this Court, as alleged above.

68. Alcor's and Frappa's actual and threatened misappropriation has been willful and egregious.  Frappa was a trusted employee who helped develop Alifax's ESR analyzer and then left the company and immediately used the knowledge gained at Alifax to build the same machine for another company, Alcor, embodying the technology developed in confidence at Alifax and sold in direct competition with Alifax.  Therefore, Alifax is entitled to an award of exemplary damages and attorneys' fees.

## THIRD CAUSE OF ACTION

### (Breach of a Confidential Relationship)

69. Alifax hereby incorporates by reference and realleges each of the allegations contained in the foregoing paragraphs 1 through 52, inclusive, as though fully set forth in this cause of action.

70. At all relevant times, Alifax was in possession of confidential information as described above.

71. As an employee of Alifax, Frappa had a fiduciary duty not to use the confidential information of Alifax to compete with his former employer.

72. Frappa disclosed Alifax's confidential information to Alcor and Frappa and Alcor used the information to compete with Alifax.

73. Frappa and Alcor breached Frappa's fiduciary duty to Alifax.

74. Alifax has suffered damage proximately caused by the breach of fiduciary duty by Frappa and Alcor including lost sales, lost customers and lost good will.

## PRAYER FOR RELIEF

WHEREFORE, Alifax prays that the Court enter an Order:

1. That Alcor has infringed U.S. Patent Nos. 6,632,679 and 7,005,107;

2. Permanently enjoining Alcor and its respective agents, servants, officers, directors, employees, and all persons acting in concert with them, directly or indirectly, from infringing U.S. Patents Nos. 6,632,679 and 7,005,107;

3. Permanently enjoining Alcor and Frappa and Alcor's respective agents, servants, officers, directors, employees, and all persons acting in concert with them, directly or indirectly,

from obtaining, accessing, using, retaining, utilizing or disclosing Alifax's confidential, proprietary or trade secret information;

4. Requiring the immediate disclosure and return to Alifax of all misappropriated materials, including all media and electronic storage devices and virtual repositories, including but not limited to any Memeo accounts, portable USB storage devices utilized by Frappa or Alcor, and hard drives utilized by Frappa or Alcor;

5. Imposing a constructive trust in favor of Alifax for the ownership of U.S. Patent No. 8,647,886;

6. That Alifax be awarded compensatory damages it has suffered, in an amount to be proved at trial;

7. That Alifax be awarded exemplary damages for all claims for which such damages are authorized;

8. That Alifax be awarded attorneys' fees and the costs of this action as permitted by statute;

9. That Alcor and Frappa be ordered to disgorge all improper benefits, profits, or gains;

10. For an accounting of the misuses of Alifax's information and property and other unlawful acts;

11. That Alifax be awarded such other and further relief as the Court deems equitable and just.

Date:  October 7, 2014                    Respectfully submitted,


                                          /s/ Christopher H. Little
                                          /s/ Michael J. Daly
                                          Christopher H. Little, Esq. (#1789)
                                          Michael J. Daly, Esq. (#6729)
                                          Pierce Atwood LLP
                                          72 Pine Street, 5th Floor
                                          Providence, RI 02903
                                          (401) 588-5113 [tel.]
                                          (401) 588-5166 [fax]
                                          clittle@pierceatwood.com
                                          mdaly@pierceatwood.com


                                          Stuart E. Benson (pro hac vice motion forthcoming)
                                          Manelli Selter PLLC
                                          2000 M Street, N.W. Suite 700
                                          Washington, DC 20036
                                          Tel. 202.261.1030
                                          Fax 202.887.0336
                                          sbenson@mdslaw.com