UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALIFAX HOLDING SPA,

    Plaintiff,

v.

ALCOR SCIENTIFIC INC.; and
FRANCESCO A. FRAPPA,

    Defendants.

C.A. No. 14-440-S

## AFFIDAVIT OF GIOVANNI BATTISTA DUIC

I, Giovanni Battista Duic, having been duly sworn, state as follows:

1. I was one of the founders of Sire Analytical Systems, S.r.l. ("Sire"), and for many years, I served as that company's Managing Director.

2. Sire was organized as a limited liability company under the laws of Italy, and its principal research and manufacturing facilities were always located in Udine, Italy.

3. Alifax Holdings S.p.A. ("Alifax"), the Plaintiff in this action, acquired Sire in 2004, and in 2015 Sire merged entirely into Alifax. Alifax is a corporation organized under Italian law. Its principal place of business is in Padova, Italy.

4. In my role as an officer of Sire, I was personally involved in hiring Francesco Frappa, in his promotions, and in supervising his work throughout his years of employment.

5. I first met Frappa when he was a trainee at Sire during the Spring of 2000. He was training through an internship program that was sponsored by a technical institute located in Sire's home city of Udine, Italy. At the time, Frappa, a citizen of Italy and a resident of San Vito

al Tagliamento, Udine, Italy, was enrolled as a student at the local technical institute and was completing his secondary education.

6.  When his internship ended, Frappa asked me to hire him. I agreed and offered him employment at Sire as a mechanical fitter apprentice. Frappa accepted the offer. All of the discussions leading to Frappa's employment, as well as the agreement itself, occurred in Udine, Italy.

7.  Sire hired Frappa as a mechanical fitter apprentice in October 2002. The "Lettera di Assunzione," or employment letter formalizing his employment, like all such letters for Sire employees, refers to Italian law and reflects both sides' understanding that the employment relationship is to be governed by Italian law, including the Italian National Collective Bargaining Agreement ("NCBA") applicable to Sire's industry. The incorporated provisions of Italian law and the NCBA are considered "standard terms" for all of employees. A true copy of Frappa's original employment letter, with a certified translation, is attached as Exhibit A.

8.  Among its other provisions, the NCBA governing Frappa's employment relationship provides that employees must maintain absolute secrecy and confidentiality as to the information they learn about an employer's business during employment. It is commonly understood within Sire's industry that the applicable NCBA imposes a strict duty of confidentiality both before and after employment.

9.  It is commonly understood among Italian employers and employees that Italian statutes also impose strict rules of confidentiality on Italian employees, some of which also impose criminal penalties in the event of a violation. At the time of Frappa's employment relationship, both parties understood that such Italian laws would apply to the relationship.

10. Frappa's work as a mechanical fitter apprentice involved final assembly and packaging of instrumentation from semi-finished parts and components according to a detailed written procedure. While the work of mechanical fitters must be performed with care and precision, the work does not entail any research, the development of any technology, or the design of any component. Prior to his employment by Sire, Frappa had no work experience in the design, development, or manufacture of erythrocyte sedimentation rate ("ESR") analyzers or similar devices.

11. Following Sire's acquisition by Alifax in 2004, Frappa continued working as a mechanical fitter apprentice, and despite the corporate change, the standard terms of Frappa's employment continued unchanged.

12. In October 2004, Frappa's employment status transformed from apprenticeship to permanent employment as a mechanical fitter. Notwithstanding this change, the standard terms of Frappa's employment continued unchanged.

13. During his years of employment with Sire and Alifax, Frappa was promoted several times to positions of increasing responsibility and authority. At all times, Frappa worked at Sire's facilities in Udine and Nimis, Italy.

14. As he was promoted, Frappa's job title, responsibilities, and benefits changed, but the parties at all times understood and believed that the standard terms of his employment contract remained unchanged. His employment relationship remained at all times subject to Italian law and the applicable industry NCBA.

15. In 2004, I was responsible for managing Sire's efforts to develop and advance the hardware, firmware, and computer code used in Sire/Alifax ESR analyzers. Frappa wanted to learn about hardware and software design, and he asked me to allow him to become involved in

Case 1:14-cv-00440-MSM-LDA    Document 156    Filed 04/09/18    Page 4 of 6 PageID #: 6044

that part of the company's operations. I agreed, and Frappa joined Sire's software development group and began working as a hardware and firmware designer.

16.     Over time, as Frappa learned about ESR analyzers and became a capable hardware, firmware, and software designer, he was promoted. Eventually, Frappa became responsible for the company's overall program of firmware development and electronic and software design.

17.     By 2008, Sire/Alifax promoted Frappa to Senior Manager of hardware and software/firmware design and Assistant Director of research and development. In this role, Frappa was responsible for overseeing all aspects of ESR analyzer innovation and development. He also became the principal developer responsible for the company's proprietary and confidential source code used in all of Alifax's ESR analyzers and in other analytical instrumentation.

18.     In his role as Senior Manager and Assistant Director, Frappa personally wrote and led the development of several iterations of the source code used in Sire/Alifax ESR analyzers, including the algorithms and code used to determine the ESR of a blood sample from photometric data acquired by the ESR analyzers.

19.     The nature of Frappa's work was highly confidential, and Frappa was aware of this. As Senior Manager and Assistant Director, for example, Frappa attended research and development meetings at Alifax's company headquarters in Padova, Italy, where confidentiality and intra-company communications were prominent agenda items. I attended many such meetings with Frappa, and I have personal knowledge that Frappa knew that his work, and all Sire/Alifax research and development work, was deemed highly confidential and treated as such.

{W6616433.1}                    4

20. Prior to his resignation, Frappa was also in charge of a highly confidential Sire/Alifax project—code named "Mecca"—to develop a more accurate and consistent capillary photometer sensor ("CPS") for the company's ESR analyzers. Project Mecca resulted in the invention of a new milled-plastic CPS, and Frappa was the person principally responsible for updating the algorithms and related firmware used to calculate ESR from the photometric measurements obtained by the new CPS technology.

21. All of Frappa's work for Sire and Alifax, from the time of his apprenticeship through the development of the new CPS as the head of Project Mecca, occurred at Sire company facilities in Udine and Nimis, Italy, or at Alifax company headquarters in Padova, Italy.

22. On August 30, 2011, Frappa gave notice of his intention to resign from his employment. As stated in his resignation letter, a true copy of which, with a certified translation, is attached as Exhibit B, [redacted]

23. At the time Frappa gave notice of his resignation, he told me that he simply wanted to have a different kind of job. He did not tell me that he intended to go to another company that sold medical devices or help develop a product to compete with the Sire/Alifax ESR analyzers. Thus, I prepared a reference letter for Frappa which [redacted] A true copy of my reference letter, with a certified translation, is attached as Exhibit C.

24. Frappa's employment contract with Sire, and later with Alifax, was negotiated and made entirely within Italy. Both Frappa's performance of the contract, as well as Sire's and Alifax's performance, occurred in Italy.

25. At all times during Frappa's employment with Sire and Alifax, the location of Frappa's employment was Italy. He worked in Udine and Nimis, commuting from a nearby Italian town where he lived during the time he was employed. While an employee, Frappa reported to me and to his other direct supervisors, all of whom were in Italy. Frappa was paid for his employment in Italy. In addition to salary, Frappa's compensation included the use of a company car in Italy and, after 2009, the use of an apartment in Udine, Italy.

26. At all times during Frappa's employment relationship with Sire and Alifax, his work location, the equipment and facilities he used, and the subject matter of his work was located in Italy.

27. At all times Sire and Alifax intended, anticipated, and expected that the terms of Frappa's employment relationship were governed by Italian law, and not by the laws of the United States or any other jurisdiction. I believe that Frappa also intended, anticipated, and expected during the term of his employment that his employment relationship was governed by Italian law.

I DECLARE, PURSUANT TO 28 U.S.C. § 1746, UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA, THAT THE FOREGOING IS TRUE AND CORRECT.

Subscribed and sworn to this 05th day of April, 2018.

_____
Giovanni Battista Duic