UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALIFAX HOLDING SPA,

          Plaintiff,

    vs.

                                        C.A. No. 14-440-S

ALCOR SCIENTIFIC INC. and
FRANCESCO A. FRAPPA,

          Defendants.

**MOTION TO EXCLUDE THE OPINIONS OF
EXPERT WITNESS CHRISTOPHER J. BOKHART**

**TABLE OF CONTENTS**

I.    RELEVANT FACTS AND BACKGROUND .................................................... 2

II.    ARGUMENT ................................................................................................... 3

      A.    Bokhart's Lost Profits Analysis Is Unreliable and Not Based on Proper Underlying Data. ................................................................................. 5

      B.    Bokhart's Reasonable Royalty Analysis is Also Based on An Incorrect Factual Premise. ................................................................................ 9

            1.    Bokhart Erroneously Fails to Apportion the Royalty Base. ..................... 10

            2.    Bokhart's Royalty Rate Opinion Lacks an Adequate Factual Basis......... 12

      C.    Bokhart's Trade Secret Misappropriation Damages Opinion is Unreliable. ........ 14

            1.    Bokhart's Trade Secret Damages Opinion is Speculative. ....................... 14

            2.    Bokhart's Opinion as to "Head Start" Damages is Late and Lacks a Dependable Foundation ........................................................... 16

      D.    Bokhart's Copyright Infringement Damages Opinion Lacks Foundation. ........... 17

III.    CONCLUSION ............................................................................................... 18

i

**TABLE OF AUTHORITIES**

**Cases**                                                                                         **Page**

*Asetek Danmark A/S v. CMI USA Inc.*,
   852 F.3d 1352 (Fed. Cir. 2017) ................................................................................ 5

*Astro-Med, Inc. v. Plant*,
   C.A. No. 06-533 ML, 2008 WL 2883769 (D.R.I. July 25, 2008) ........................... 14

*Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
   1 F.3d 1214 (Fed. Cir. 2013) ................................................................................... 6

*Bowling v. Hasbro, Inc.*,
   C.A. No. 05-229S, 2008 WL 717741 (D.R.I. Mar. 17, 2008) ..................... 12, 13, 17

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*,
   752 F.3d 82 (1st Cir. 2014) ..................................................................................... 4

*Calico Brand, Inc. v. Ameritek Imports, Inc.*,
   527 F. App'x 987 (Fed. Cir. 2013) ................................................................... 5, 8, 9

*Casas Office Machs. Inc. v. MITA Copystar Am., Inc.*,
   42 F.3d 668 (1st Cir. 1994) .................................................................................. 4, 9

*Crowe v. Marchand*,
   506 F.3d 13 (1st Cir. 2007) ..................................................................................... 3

*Damon v. Sun Co., Inc.*,
   87 F.3d 1467 (1st Cir. 1996) ................................................................................... 4

*Data General Corp. v. Grumman Sys. Support Corp.*,
   36 F.3d 1147 (1st Cir. 1994) ................................................................................. 17

*Daubert v. Merrel Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................................ 4

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009) ........................................................................... 6, 9

*Ericsson, Inc. v. Harris Corp.*,
   352 F.3d 1369 (Fed. Cir. 2003) ............................................................................... 5

*Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Group*,
   879 F.3d 1332 (Fed. Cir. 2018) ............................................................................. 11

*Hebert v. Lisle Corp.*,
   99 F.3d 1109 (Fed. Cir. 1996) ................................................................................. 6

ii

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ................................................................................ 10, 11, 12

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .................................................................................... 10

*Minks v. Polaris Indus., Inc.*,
    546 F.3d 1364 (Fed. Cir. 2008) .................................................................................... 10

*Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992) ...................................................................................... 5

*Panduit Corp. v. Stalin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ..................................................................................... 5, 6

*Riani v. Louisville Ladder, Inc.*,
    Civil Action No. 07–40258–FDS, 2010 WL 2902040 (D. Mass. July 14, 2010) ....................... 5

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) ...................................................................................... 9, 10

*Rite–Hite*, 56 F.3d at 1549, 1551 ...................................................................................... 10

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) ...................................................................................... 5

*ThinkOptics, Inc v. Nintendo of Am., Inc.*,
    No. 6:11–CV–4552, 014 WL 3419974 (E.D. Tex. June 21, 2014) ........................................ 12

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed.Cir.1986) ......................................................................................... 10

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ................................................................................... 10, 12

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308, 1327 (Fed. Cir. 2014) .......................................................................... 10, 12

*Wai Feng Trading Co. Ltd. v. Quick Fitting, Inc.*,
    No. 13-33WES, 2018 WL 6726557 (D.R.I. Dec. 21, 2018) ............................................... 4

**Statutes**

17 U.S.C. § 504(b) ......................................................................................................... 17

35 U.S.C. § 284 .............................................................................................................. 5

**Rules**

Fed. R. Evid. 403 ........................................................................................................... 4

iii

Defendants Alcor Scientific, Inc. ("Alcor") and Francesco A. Frappa ("Frappa") (collectively, "Defendants") respectfully request that the Court issue an order precluding Plaintiff Alifax Holding SpA ("Alifax") from offering Christopher J. Bokhart ("Bokhart") as an expert witness on damages. Every facet of Bokhart's opinion on Alifax's alleged patent infringement damages springs from his assumption that the patents-in-suit claim an erythrocyte sedimentation rate ("ESR") analyzer that obtains results based on a "Patented 20 Second Results Feature." This assumption is wrong. The patents-in-suit claim a method or apparatus that obtains the viscosity, elasticity, and density of a blood sample, in addition to the speed of sedimentation. No claim of either patent contains the "20 second" limitation Bokhart relied on, and he makes no effort to value the patented technology set forth in the asserted claims in his lost profits analysis. Nor does Bokhart apportion the patented improvement from the non-infringing features of Alcor's iSED ESR analyzer (the "iSED") in his reasonable royalty analysis. Bokhart's resulting lost profits and reasonable royalty opinions result from flawed methodology and are unreliable and misleading.

Bokhart's trade secret misappropriation and copyright infringement damages opinions are also based, in their entirety, on the assumption that Alifax's alleged trade secrets and source code copyright registrations resulted in Alcor producing an analyzer device that can obtain ESR results in 20 seconds. Bokhart then assumes that one hundred percent of Alcor's iSED revenue is directly attributable to this functionality. These assumptions are speculative and divorced from the evidence in this case. In particular, since Bokhart issued his initial damages report in September, 2017, Alifax abandoned the majority of its trade secret claims. Yet, Bokhart's January 2019 Supplemental Report does not acknowledge or adjust for the shrunken trade secret allegations, and it still maintains that all iSED revenue is directly caused by the alleged

1

misappropriation of Alifax's trade secrets, even one that was no longer a trade secret before this case began. Similarly, although Alifax's technical expert's 2019 Supplemental Report now opines that no more than four Alcor devices sold in 2013 contain Alifax's allegedly copyrighted source code, Bokhart still opines that all iSED revenue over nearly six years is directly attributable to Alcor's alleged copyright infringement.

Because Bokhart's damages opinions are unreliable and based on flawed methodologies, his testimony would mislead rather than help the jury. As a result, the Court should preclude Bokhart from offering damages opinions at trial.

## I.    RELEVANT FACTS AND BACKGROUND

Alifax asserts three claims against Alcor related to the iSED: (1) infringement of U.S. Patent No. 6,32,679 (the "'679 patent") and U.S. Patent No. 7,005,107 (the "'107 patent"); (2) trade secret misappropriation; and (3) infringement of three copyright registrations relating to Alifax's source code for its Roller20PN and Test-1 ESR analyzers.

In a report dated October 30, 2017, Bokhart opined that Alifax's economic damages associated with Alcor's alleged patent infringement are equal to the profits Alifax would have made had it sold every iSED device Alcor has sold (other than 12 iSED units Alcor sold in countries where Alifax has no distributors), at the price of Alifax's Roller20PN and Roller 20LC analyzers. *See* Exhibit 1, Expert Report of Christopher J. Bokhart dated October 30, 2017 ("Bokhart Report"), at pp. 4-5. In doing so, Bokhart attributed 100% of the iSED's revenue to its allegedly infringing features, which Bokhart defines as the capability to produce ESR results in 20 seconds. *See id.* at p. 18. Bokhart further opined that a reasonable royalty on iSED sales would be $4,000 per analyzer. *See id.* at p. 62. This opinion again attributes 100% of the iSED's market value to its purported ability to obtain an ESR result in 20 seconds, which Bokhart assumes to be the patented technology. *See id.* at pp. 43, 48, 53-54, 60.

2

As to trade secret damages, Bokhart opined that Alifax is entitled to 100% of Alcor's revenue earned from sales of the iSED, based his assumption that "Alifax's trade secrets have a direct, causal relationship to the ability to produce an ESR result in 20 seconds." *Id.* at p. 65. Similarly, Bokhart opined that for copyright infringement damages, Alifax is entitled to 100% of Alcor's revenue earned from the sale of the iSED, again attributing 100% of iSED revenues to "the ability to produce an ESR result in 20 seconds." *Id.* at p. 67.

On January 16, 2019, Bokhart issued a supplemental expert report with updated Alcor sales information. *See* Exhibit 2, January 16, 2019 Expert Report of Christopher J. Bokhart ("Bokhart Supplemental Report"), at p. 1. Bokhart's methodology used to calculate Alifax's damages did not change. *See id.* at pp. 4, 6. However, in a footnote to Exhibit 8.2A S, Bokhart belatedly opined for the first time that Alcor received an additional year of iSED revenue from its alleged misappropriation of Alifax's software-related trade secret. *See id.* at Ex. 8.2A S, n. 3.

## II.    ARGUMENT

Pursuant to Fed. R. Evid. 702, an expert qualified by knowledge, skill, experience, training or education may proffer expert testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Federal Rules of Evidence afford district courts substantial latitude in the admission or exclusion of opinion evidence." *Crowe v. Marchand*, 506 F.3d 13, 16 (1st Cir. 2007). For an expert opinion to be admissible, "[f]irst, there must be a reliable foundation for the opinion, which necessitates an inquiry into the expert's methodology and the basis for his conclusions. Second, there must be an adequate fit between the expert's methods and his conclusions." *Wai Feng Trading Co. Ltd. v. Quick Fitting, Inc.*, No. 13-33WES, 2018 WL 6726557, at *6 (D.R.I.

3

Dec. 21, 2018) (citing *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 591, 597 (1993)). As the proponent of the expert testimony at issue, Alifax bears the burden of establishing that Bokhart's testimony is relevant and reliable. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 96 (1st Cir. 2014).

Because "[e]xpert evidence can be both powerful and quite misleading," a trial court must take special care to weigh the risk of unfair prejudice against the probative value of the evidence under Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595 (internal quotations omitted). Before admitting proffered expert testimony, the trial court must ensure that it is scientifically valid—that it is both reliable and relevant. *Id.* at 589, 594-95. The reliability inquiry is a flexible one, but factors to consider include: (1) whether the reasoning or methodology underlying the testimony can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) what the known or potential rate of error is, and (4) the degree of acceptance within the relevant scientific community. *See id.* at 593–94.

Further, "[i]f perscrutation reveals that there is simply too great an analytical gap between the data and the opinion proffered, the expert's testimony should be excluded." *Wai Feng Trading*, 2018 WL 6726557, at *6 (quotation omitted). Therefore, "an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996), or when it is "connected to existing data only by the *ipse dixit* of the expert," *Wai Feng Trading*, 2018 WL 6726557, at *7. Put differently, the court "may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence." *Casas Office Machs. Inc. v. MITA Copystar Am., Inc.*, 42 F.3d 668, 681 (1st Cir. 1994)). Indeed, although "challenges to the factual underpinnings of an expert's investigation

4

often go to the weight of the proffered testimony, not to its admissibility . . . . [a]n expert cannot render an opinion that is based on an incorrect factual premise or an assumption as to which there is no evidence." *Riani v. Louisville Ladder, Inc.*, Civil Action No. 07–40258–FDS, 2010 WL 2902040, at *6 (D. Mass. July 14, 2010) (quotation omitted).

A.    **Bokhart's Lost Profits Analysis Is Unreliable and Not Based on Proper Underlying Data.**

35 U.S.C. § 284 provides for patent infringement damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  The patent owner, upon proving infringement, may receive a reasonable royalty or lost profits, but not both, for the same infringing units.  *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). The amount of damages due to a patent holder for patent infringement is a question of fact for which the patent holder bears the burden of proof.  *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991).

Alifax, through Bokhart, makes a claim for lost profits damages, citing the multi-factor test articulated in *Panduit Corp. v. Stalin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).  *See* Ex. 1, Bokhart Report, at pp. 24-35.  To recover lost profits, a patentee must produce evidence of "a causal relation between the infringement and its lost profits." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003); *see also Calico Brand, Inc. v. Ameritek Imports, Inc.*, 527 F. App'x 987, 996 (Fed. Cir. 2013) ("[L]ost profits must be tied to the intrinsic value of the patented feature.").  This means that Alifax must prove by a preponderance of the evidence that "there was a reasonable probability that, 'but for' the infringement, it would have made the infringer's sales." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir.

5

1996); *Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 2013) (reversing the district court's award of lost profits under the *Panduit* test, finding that due to significant manufacture, design, and price differences in the market, along with the presence of at least fourteen competitors, the assumption underlying the *Panduit* test was not appropriate and could not be used by the patent holder to establish 'but-for' causation).

To obtain lost profits damages under the *Panduit* test, the patent holder must prove:

- Demand for the patented product;

- Absence of acceptable non-infringing substitutes;

- Its manufacturing and marketing capability to exploit the demand; and

- The amount of profit it would have made.

*Panduit Corp.*, 575 F.2d at 1156; *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1329 (Fed. Cir. 2009) (citing *Panduit*, 575 F.2d at 1156).

Bokhart's lost profits analysis begins with the premise that the technology claimed in the '679 patent and '107 patent is "ESR analyzers using a stop-and-flow technology capable of producing results in 20 seconds." Ex. 1, Bokhart Report, at p. 18. In fact, Bokhart's interpretation of the patented technology as encompassing the so-called "Patented 20 Second Results Feature" permeates nearly every step of Bokhart's damages analysis. *See, e.g., id.* at pp. 18, 28-30, 43, 46-49, 53-58. Yet Bokhart's methodology is unsupported by and contrary to the evidence, the law of the case (the Claim Construction decision) and the opinions in Alifax's technical expert's reports.

First, as Bokhart testified, neither the '679 patent nor the '107 patent contains any reference to obtaining ESR results in twenty seconds. Exhibit 3, excerpts from Deposition of Christopher J. Bokhart ("Bokhart Dep."), at 64:14-22. Nonetheless, Bokhart asserts that the

6

patents-in-suits claim a method and apparatus to conduct an ESR test that gives results within twenty seconds. *See id.* at 64:22-65:2, 65:21-66:1. The only basis Bokhart identifies for this interpretation of the patented improvement is discussions with Alifax's technical expert, Dr. Bergeron. *See* Ex. 1, Bokhart Report at p. 18, n. 93; *see also* Ex. 3, Bokhart Dep. at 66:14-57:16; 143:2-9.

Second, the U.S. Patent and Trademark Office ("PTO") initially rejected the applications for the patents as indefinite and anticipated by and/or obvious in light of prior art teaching the use of a stop-and-flow method for analyzing the aggregation of blood. Dkt. No. 73 at p. 11. The applicant responded by amending the claims to specify that the patented technology obtains, in addition to speed of sedimentation, viscosity, elasticity, and density. *Id.* The PTO then allowed the applications. *Id.* at p. 12. Thus, as the Court determined, Alifax "narrowed the scope of the claim . . . by articulating the precise characteristics of the blood sample measured by the method." *Id.* Notably, just as the purported 20-seconds result feature does not appear in the patents-in-suit, it is also absent from the prosecution histories and the Court's Claim Construction decision. *See generally* Dkt. No. 73.

Accordingly, the incremental value of the patented technology – as distinguished from the prior art – is the claimed method or apparatus obtaining the viscosity, elasticity, and density of blood by processing acquired optical density or absorbance data. Yet Bokhart admits that he had no understanding that Alifax narrowed its claims to a method or device that obtains all four parameters. Ex. 3, Bokhart Dep., at 74:4-11; 75:14-23. Despite offering calculations for lost profits and reasonable royalty, Bokhart did not take into account whether the iSED obtains viscosity, elasticity, and density. *See id.* at 146:7-15.

As a result, Bokhart's lost profits methodology is flawed. His analysis hinges on a

demonstrably incorrect assumption that the patented technology at issue is the ability to obtain ESR results in approximately 20 seconds.  That flawed methodology implicates several *Panduit* factors.  First, Bokhart asserts that the first *Panduit* factor (demand for the patented product) is demonstrated by Alifax's sales of its ESR analyzers and Alcor's sales of the iSED.  Ex. 1, Bokhart Report, at p. 24.  According to Bokhart, Alifax's and Alcor's sales demonstrate clear demand for ESR analyzers "with the Patented 20 Second Results Feature."  *Id.* at p. 28.  Not only did Bokhart fail to address other iSED attributes that may contribute to market demand,[1] but his singular focus on demand for an ESR analyzer that produces results in approximately 20 seconds is irrelevant to demand for the patented technology, i.e. a method or device that obtains the speed of sedimentation, viscosity, elasticity, and density of a blood sample.  *See Calico Brand, Inc.*, 527 F. App'x at 996 ("demand for the entire apparatus is, in most circumstances, not interchangeable with demand for a patented component of the larger apparatus," and "lost profits must be tied to the intrinsic value of the patented feature").

Next, Bokhart determined that no acceptable non-infringing alternatives exist because "products lacking the advantages of the Patented 20 Second Results Feature cannot be considered substitutes acceptable to customer who want these advantages (Alifax and Alcor customers)."  Ex. 1, Bokhart Report, at p. 28.  Thus, again, Bokhart's analysis improperly focuses whether other ESR analyzers can produce results in 20 seconds, which ignores the availability of numerous ESR analyzers on the market that are non-infringing alternatives.  *See* Ex. 3, Bokhart Dep., at 108:24-109:5; 109:22-110:3 (acknowledging Alifax's total share of the

---

[1] Even if Bokhart had properly identified the scope of the patented technology, his lost profits analysis would still be flawed because he failed to consider properly a number of features that differentiate the iSED from Alifax's ESR analyzers, including the iSED's continuous feed, internal bar code reading, the ability to interrupt the cycle, the ability of the operator to walk away from the device, higher through-put per higher, lower price, and that the iSED is made in the United States.  *See* Ex. 3, Bokhart Dep., at 100:10-23; 101:16-20; 102:14-103:2; 104:9-21; 105:15-24; *see also* Ex. 1, Bokhart Report, at p. 37, n. 170.  Bokhart's lost profits analysis is unreliable for this additional reason.

8

U.S. ESR market is less than one percent); *see also DePuy Spine, Inc.*, 567 F.3d at 1330-31 (explaining that the absence of non-infringing alternatives analysis focuses on the demand for particular limitations or features of the patented invention).  Bokhart fails to explain why these competitive ESR analyzers would not be acceptable alternatives.  *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1548 (Fed. Cir. 1995) (where non-infringing substitutes exist, patentee must prove that its customers would not have found the substitute acceptable).

Building off his flawed determinations that demand exists for the patented technology and that no acceptable non-infringing substitutes exist, Bokhart opines that Alifax would have made all of Alcor's iSED sales in the United States and other countries where Alifax also operates.  Ex. 1, Bokhart Report, at p. 34.  Even Bokhart concedes that his opinion would be "impacted" if the patented claims do not bear a "relationship to the speed of the tests."  *See* Ex. 3, Bokhart Dep., at 68:2-6.  Because Bokhart's opinion is based on his incorrect assumption that the patented technology claims an ESR analyzer that can produce results in close to 20 seconds, Bokhart's lost profits opinion is not reliable and should be excluded.  *See Casas Office Machs., Inc.*, 42 F.3d at 681 (approving of exclusion of expert testimony where "the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence"); *see also Calico Brand, Inc.*, 527 F. App'x at 996-97 (reversing award of lost profits where patentee did not establish consumer demand for the patented features or an absence of non-infringing acceptable substitutes).

**B.      Bokhart's Reasonable Royalty Analysis is Also Based on An Incorrect Factual Premise.**

Bokhart's reasonable royalty analysis suffers from the same infirmity as his lost profits analysis because it is derived from an incorrect assumption as to the scope of the patented

technology. That leads Bokhart to: (1) fail to apportion properly the royalty base; and (2) overstate a reasonable royalty rate.

### 1. Bokhart Erroneously Fails to Apportion the Royalty Base.

Calculation of a reasonable royalty requires determination of two separate quantities: a royalty base and a royalty rate. These calculations, though related, are distinct. *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1373 n. 6 (Fed. Cir. 2008).

Federal Circuit precedent makes clear that apportionment of the royalty base is generally required where a patent is directed to one component of a multicomponent product containing both patented and unpatented features. *See*, *e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). An over-inclusive royalty base that includes revenues from the sale of non-infringing components is not permissible. *See Rite–Hite*, 56 F.3d at 1549 n. 9 ("This issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate.").

The entire market value rule is a narrow exception to this general rule. If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product. *Rite–Hite*, 56 F.3d at 1549, 1551. In other words, "[t]he entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *Lucent*, 580 F.3d at 1336 (*quoting TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986)); *Uniloc USA*, 632 F.3d at 1318.

In the majority of cases, however, where apportionment of the base was required, the patentee is not permitted to present the jury with a damages theory based on the revenues of the entire product as a whole, but must identify the portion of those revenues that were allocable to the patent. *LaserDynamics*, 694 F.3d at 67–68. The Federal Circuit reasons that starting with an inflated base would unfairly prejudice the defendant by presenting the jury with irrelevant, inflated numbers, as that would naturally lead them to a larger damages number than they might find if presented with a proper royalty base. *Id.* (noting that "the $19 billion cat was never put back into the bag," and that neither cross-examination nor a curative jury instruction could have offset the resulting unfair prejudice). Recently, in *Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Group*, 879 F.3d 1332 (Fed. Cir. 2018) the Federal Circuit reversed a reasonable royalty damages award because the patent owner's damages expert failed to properly apportion the claimed invention's value (an improved lawn mower baffle) from the unpatented components in the mower. That same analysis requires preclusion of Bokhart's opinion.

Bokhart unquestionably uses the entire market value of the iSED as the royalty base for his reasonable royalty calculation. Ex. 1, Bokhart Report, at p. 63 ("The reasonable royalty base is the number of iSED analyzers on which lost profits are not claimed."). This, by definition, is an application of the entire market rule. *LaserDynamics*, 694 F.3d at 68. As set forth above, this royalty base is only proper where the patented feature creates the basis for customer demand for the accused product. Bokhart concludes that the so-called "20 Second Results Feature" creates demand for the iSED. *See, e.g.*, Ex. 1 at pp. 16, 28, 36, 49, 53. Yet, as discussed in detail *supra*, the patented technology is obtaining viscosity, elasticity, and density, not measuring ESR in 20 seconds, and Bokhart has not identified any evidence that the ability to practice the patented

11

invention drives consumer demand.[2]  This is particularly true here because Alifax has never sold a product that obtains viscosity, elasticity, density and ESR.  Accordingly, Bokhart's use of the entire market value as a royalty base is improper and misleading, and his reasonable royalty analysis should be precluded.  *Virnetx, Inc,* 767 F.3d at 1308 (the district court should have exercised its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury); *Uniloc USA*, 632 F.3d at 1318-20 (affirming use of entire market value improper and prejudicial to alleged infringer where the patentee could not show the patented elements of the accused product drove consumer demand); *ThinkOptics, Inc v. Nintendo of Am., Inc.*, No. 6:11–CV–4552, 014 WL 3419974, at *2-*3 (E.D. Tex. June 21, 2014) (granting motion to exclude Bokhart's reasonable royalty opinion because Bokhart improperly applied the entire market value rule and failed to disclose any apportionment calculation)

### 2.    Bokhart's Royalty Rate Opinion Lacks an Adequate Factual Basis.

Bokhart's reliance on an unsupported interpretation of the patented technology as encompassing the ability to produce ESR results in 20 seconds also renders his royalty rate calculation unreliable.  "[W]hile the *Georgia-Pacific* rubrics is presumptively reliable in both principle and methodology, expert opinion based on the *Georgia-Pacific* factors may be precluded where the opinion lacks an adequate factual basis or fails to demonstrate that such principles and methodology have been applied reliably to the facts of the case." *Bowling v. Hasbro, Inc.*, C.A. No. 05-229S, 2008 WL 717741, at *3 (D.R.I. Mar. 17, 2008).

---

[2] Even if Bokhart were correct that the patents-in-suit claim the ability to produce ESR results in close to 20 seconds, his failure to separate this feature of the iSED from the numerous other features of the iSED discussed *supra* n. 2 would render his reasonable royalty opinion unreliable. *See LaserDynamics*, 694 F.3d at 68 ("It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [overall product]."

12

Bokhart's *Georgia-Pacific* analysis is replete with reliance on the incorrect assumption that the patents claim the so-called "20 Second Results Feature." *See, e.g.*, Ex. 1, Bokhart Report, at pp. 46-47 (fourth *Georgia-Pacific* factor would have an upward impact on the royalty rate because "Alifax enjoyed an 'uncontested' monopoly on the sale of [ESR analyzers] capable of producing results in 20 seconds," and therefore would not license the patents-in-suit to any third party); *id.* at pp. 47-49 (fifth *Georgia-Pacific* factor would have an upward impact on the royalty rate because Alifax and Alcor are the only members of the alleged market for 20-second ESR analyzers); *id.* at pp. 53-54 (eighth and eleventh *Georgia-Pacific* factors would have an upward impact on the royalty rate because of demand for ESR analyzers employing the so-called "20 Second Results Feature" and this feature was allegedly "crucial" to the iSED's commercial success); *id.* at pp. 54-58 (ninth and tenth *Georgia-Pacific* factors would have an upward impact on the royalty rate because the patents, as construed by Bokhart, enable significant leaps in speed of ESR analysis); *id.* at pp. 61-62 (basing reasonable royalty calculation on facts including absence of other ESR analyzers capable of producing results in 20 seconds and alleged consumer demand for ESR analyzers capable of producing results in 20 seconds).

In other words, Bokhart increased his reasonable royalty calculation no fewer than five times based on an incorrect understanding of the patents. Bokhart's analysis for each of these factors lacks an adequate foundation, rendering his resulting reasonable royalty opinion unreliable. *See Bowling*, 2008 WL 717741 at *4-*7 (excluding reasonable royalty opinion as unreliable where assumptions underlying application of *Georgia-Pacific* factors were either speculative or contrary to established facts).[3]

---

[3] In his discussion of the thirteenth *Georgia-Pacific* factor, Bokhart purports to distinguish the portion of Alcor's iSED profits that should be credited to the patented invention as opposed to non-patented elements. *See* Ex. 1, Bokhart Report, at pp. 59-61. However, even this analysis credits 100% of the

13

In summary, Bokart's reasonable royalty analysis fails to apportion the royalty base to the claimed invention and overstates the appropriate royalty rate based on the erroneous application of several *Georgia-Pacific* factors tied to the alleged value of the "20 Second Results Feature" instead of the claimed invention. Bokhart's reasonable royalty opinion should be excluded.

### C.    Bokhart's Trade Secret Misappropriation Damages Opinion is Unreliable.

Bokhart's opinion on Alifax's damages related to alleged trade secret misappropriation suffers from the same type of infirmity as his patent infringement damages calculations: it is untethered to the evidence of this case.

### 1.    Bokhart's Trade Secret Damages Opinion is Speculative.

Trade secret misappropriation damages, like patent infringement damages, must bear a causal relationship to the defendant's misappropriation. *Astro-Med, Inc. v. Plant*, C.A. No. 06-533 ML, 2008 WL 2883769, at \*2 (D.R.I. July 25, 2008) (citing R.I. Gen. Laws § 6-41-3(a)). Bokhart's trade secret misappropriation damages calculation assumes "that Alifax's trade secrets have a direct, causal relationship to the ability to produce an ESR result in 20 seconds." Ex. 1, Bokhart Report, at p. 65. Bokhart opines that Alifax is entitled to Alcor's entire revenue on every iSED device sold, again assuming (without foundation) that 100% of iSED revenue is attributable to the iSED's ability to produce results in close to 20 seconds. *See id.* at pp. 65-66.

Bokhart's assumption that Alifax's alleged trade secrets are directly related to the ability to produce an ESR result in 20 seconds is pure speculation. Like Bokhart's mis-understanding of the patents in issue, Bokhart's understanding of Alifax's alleged trade secrets is based solely on discussions with Dr. Bergeron. *See id.* at p. 65, n. 296. Bokhart testified that he does not know whether any particular trade secret has a direct, causal relationship to the ability to produce an

---

iSED's profits to the allegedly infringing ability of the iSED to produce results in 20 seconds, and thus fails to credit Alcor for the non-infringing elements of the iSED. *See id.* at 62-63.

14

ESR result in 20 seconds—despite claiming otherwise in his report. Ex. 3, Bokhart Dep., at 194:9-195:7.

Moreover, when Bokhart issued his initial Report, Alifax sought damages for nine alleged trade secrets. *See* Dkt. No. 144-23 (Plaintiffs' Second Amended Identification of Misappropriated Trade Secrets dated March 20, 2017). During summary judgment briefing, Alifax abandoned or significantly narrowed six of those claims, leaving only three alleged trade secrets: (1) the use of a single block of clear acrylic as a plastic capillary photometer sensor; (2) portions of Alifax's source code containing constants used in its algorithm for calculating ESR; and (3) research regarding the anemia factor and myeloma. *See* Dkt. No. 167 at p. 19, n.2; *id.* at p. 21, n.3; Dkt. No. 180 at pp. 9-10. Despite alleging in his initial Report that the combination of the nine trade secrets were responsible for 100% of Alcor's iSED revenue, Bokhart made no adjustment in his 2019 Supplemental Report to account for those abandoned trade secret claims. In other words, Bokhart now opines that the remaining three purported trade secrets are entirely responsible for 100% of Alcor's iSED revenue. *See* Ex. 2, Bokhart Supplemental Report, at p. 6.

Compounding these errors, two of the three trade secrets have no application in any damages analysis. Alifax concedes that the "clear plastic" reading chamber alleged trade secret ceased to be a trade secret as of February 2014. There is no evidence that the iSED uses, used or acquired the so-called myeloma and anemia factor trade secrets.

Bokhart has no defensible methodology for opining that Alcor's iSED revenues resulted from the alleged misappropriation of any remaining trade secret asserted by Alifax. That renders Bokhart's trade secret damages opinion speculative and those opinions should be precluded. *See Bowling*, 2008 WL 717741, at *4 ("[A]n expert opinion is not admissible when it is connected to existing data only by the *ipse dixit* of an expert.").

15

### 2.    Bokhart's Opinion as to "Head Start" Damages is Late and Lacks a Dependable Foundation.

Not only does the Supplemental Report ignore Alifax's abandonment of most trade secret allegations, but it also belatedly introduces a new trade secret damages theory, buried in an exhibit footnote.

In his initial report, Bokhart did not opine on so-called head start damages, i.e. damages tied to an advantage of reduced development time resulting from Alcor's alleged trade secret misappropriation. *See generally* Ex. 1.  At deposition, Bokhart agreed that none of the evidence presented to him by that point supported a head start theory.  Exh. 3, Bokhart Dep., 133:16-134:6.  Yet in the Supplemental Report, Bokhart asserts that "[a]s discussed in the Expert Report of Bryan Bergeron, M.D., Alcor's use of the trade secret related to software and firmware provided it an advantage of at least one month of development time."  Ex. 2, Bokhart Supplemental Report, at Ex. 8.2A S, n. 3.

The Court should preclude Bokhart from offering a head start damages opinion at trial because it is late disclosed and lacks foundation.  Specifically, Dr. Bergeron opined that Alcor's alleged use of the asserted software trade secret provided Alcor an advantage of at least <u>one month</u> of development time.  *Id.*  Bokhart took that "one month" to leap to the conclusion that "a delay in completion" of the iSED past the date of the 2012 American Association for Clinical Chemistry ("AACC") trade show "<u>could</u> result in pushing the launch off until the AACC show the following year."  *Id.* (emphasis added).

That opinion lacks foundation.  Bokhart's assumption that if Alcor had dedicated one more month to development it would have delayed the launch of the iSED by an entire year is complete speculation.  Even though Bokhart tries to tie this assumption to deposition testimony from Carlo Ruggeri to the effect that he wanted to launch the iSED at the 2012 AACC, that

16

testimony does not support a one year delay analysis.  *See* Exhibit 4, excerpt of deposition testimony of Carlo Ruggeri, at 59:3-7; *see also* Exhibit 5, excerpt of deposition testimony of Peter Sachetti, at 156:19-157:25 (indicating that Mr. Ruggeri considered it "important" to launch the iSED in July 2012, but Mr. Sachetti "had no opinion either way" as to importance of the launch date).

This type of leap, unsupported by established facts, is the exact type of "unsupported speculation" that an expert is not permitted to undertake, and the Court should exclude Bokhart's speculative opinion as to the value of any alleged head start to Alcor.  *Bowling*, 2008 WL 717741, at *7 (requiring expert opinion testimony to be based on more than an expert's subjective belief or unsupported speculation); *Damon*, 87 F.3d at 1474.

### D.      Bokhart's Copyright Infringement Damages Opinion Lacks Foundation.

Bokhart's opinion on copyright infringement damages mirrors his trade secret damages opinion and is similarly bereft of factual and methodological support.  Copyright damages, like trade secret damages, must be causally tied to the alleged infringement.  *See* 17 U.S.C. § 504(b); *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1170 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). Bokhart again bases his damages opinion on the bare assertion that Alifax's alleged copyrights have a "direct, causal relationship to ability to produce an ESR result in 20 seconds."  Ex. 1, Bokhart Report, at p. 67.  As with Bokhart's trade secret opinion, his copyright opinion is impermissibly based on speculative assumptions that the allegedly copyrighted source code directly drives the iSED's ability to produce results in close to 20 seconds and that 100% of iSED revenue is attributable to this functionality.

Bokhart also calculates his copyright infringement damages based on the understanding that the iSED uses copyrighted source code.  *See* Ex. 3, Bokhart Dep., at 196:4-12; 197:18-24.

17

However, since the Bokhart issued his report, Dr. Bergeron issued another Supplemental Report opining that Alifax's allegedly copyrighted source is used in no more than four iSED devices. *See* Exhibit 6, Supplemental Expert Report of Bryan Bergeron, M.D., at p. 2. Although Alcor disputes that Alifax's allegedly copyrighted code is protectable, copied, or was used in any iSED device, Dr. Bergeron's supplemental opinion makes clear that Bokhart's copyright infringement damages calculation is unreliable and should be excluded.[4]

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court grant their Motion *in Limine* to exclude Christopher J. Bokhart's testimony on damages.

Respectfully submitted,

ALCOR SCIENTIFIC INC. and
FRANCESCO A. FRAPPA


*/s/ Christine K. Bush*
Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
Laurel M. Gilbert, Esq. *(Admitted Pro Hac Vice)*
**HINCKLEY, ALLEN & SNYDER LLP**
100 Westminster Street, Suite 1500
Providence, RI 02903
Tel: (401) 274-2000
Fax: (401) 277-9600
cscott@hinckleyallen.com
cbush@hinckleyallen.com
DATED:    March 19, 2019        lgilbert@hinckleyallen.com

---

[4] Notably, at the time Bokhart issued his Supplemental Report, Dr. Bergeron had already narrowed his opinion as to Alcor's use of Alifax's alleged copyrighted source code to no more than eleven iSED units sold before June 2013. *See* Dkt. No. 163-18 (dated April 8, 2018). As with his trade secret opinion, Bokhart fails to make any adjustment to his initial copyright infringement damages calculation to reflect these facts contradicting his original opinion. *See generally* Ex. 2.

18

## **CERTIFICATION**

I hereby certify that on March 19, 2019 the foregoing document was filed electronically pursuant to LR Gen 102(b) and electronically delivered to all counsel of record in this matter.

/s/ Christine K. Bush