**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ALIFAX HOLDING SPA, <br><br> Plaintiff, <br><br> v. <br><br> ALCOR SCIENTIFIC INC. and <br> FRANCESCO A. FRAPPA, <br><br> Defendants. | C.A. No. 14-440-MSM |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

Plaintiff Alifax Holding SpA ("Alifax") respectfully submits this pretrial memorandum in advance of the trial scheduled to commence on February 18, 2025.

**I.     Introduction**

A jury previously found that Defendant Alcor willfully and maliciously stole Plaintiff Alifax's proprietary ESR blood testing technology. The verdict was erroneously vacated, but the Federal Circuit reinstated it and sent the case back solely for damages.  This finding of willful and malicious misappropriation is law of the case for the upcoming damages trial.  The sole purpose of this new trial is to determine the amount that Alcor owes Alifax for the theft of the conversion algorithm trade secret. While this case is years in the making, the history relevant to the upcoming damages trial is straightforward.  After trying but failing to make a device competitive with Alifax's ESR analyzer, in 2011 Alcor recruited a key Alifax employee who delivered Alifax's trade secrets to Alcor, including the conversion algorithm that Alifax used to derive an ESR value from a blood sample.   It is undisputed that Alcor incorporated the stolen Alifax conversion algorithm into its own source code in May 2012.  This theft allowed Alcor to launch a competing ESR analyzer in July 2012 at the industry's most important trade show,

1

giving Alcor a head start of at least one year in entering the market for automated ESR analyzers.

Alcor's trade secret misappropriation is an ages old tale of uncompetitive conduct, but the procedure is lengthy. For context, Alifax filed this lawsuit in 2014 seeking monetary and injunctive relief under various theories of recovery, including misappropriation of trade secrets. At Alcor' request, the case proceeded to a bifurcated jury trial in 2019. In the liability phase, while other counts were dropped, a jury ultimately found Alcor liable for willful and malicious trade secret misappropriation. *After* this trade secret liability verdict but *before* the damages phase, Alcor affirmatively requested that a jury determine the unjust enrichment damages. In that damages phase, the same jury that *Alcor requested* awarded $6.5 million in damages based on the head start theory that was espoused in the liability phase. *See* ECF Dkt. 299.

Subsequently, the trial court ordered a new trial on liability and damages and then precluded Alifax from presenting evidence and witnesses on compensatory damages at the new trial, ending the case. This ruling was appealed and *reversed* by the Federal Circuit in its June 11, 2024 decision. Specifically, the Federal Circuit (1) "*reverse[d]* the district court's grant of a new trial as to the liability of the conversion algorithm trade secret and direct[ed] the district court to reinstate the jury verdict on this issue" and (2) "*reverse[d]* the district court's decision to preclude Alifax from presenting evidence and witnesses on compensatory damages at the new trial" and "*remand[ed]* for a new trial on damages consistent with [its] opinion." *Alifax Holding SpA v. Alcor Sci. LLC,* No. 2022-1641, 2024 WL 2932910, at *12 (Fed. Cir. June 11, 2024).

A jury has already held that Alcor engaged in the willful and malicious misappropriation of Alifax's conversion algorithm trade secret, with Alifax establishing Alcor's head start in the liability phase including both acquisition and use of the conversion algorithm trade secret. Alcor

should not be permitted to challenge or limit the effect of the verdict or the underlying facts. All that remains on remand is to hold a new jury trial on the extent of damages owed to Alifax. Put another way, Alcor should be barred from relitigating the merits of the liability case or challenging the introduction of evidence that it failed to challenge at the initial trial. This should be a simple and straightforward trial where the jury's only job is to determine damages.

## II.      Brief Description of the Case

### a.  Factual Background

This case is about devices and software for measuring the Erythrocyte Sedimentation Rate (ESR) of a human blood sample. ESR is the rate which red blood cells aggregate and separate from the plasma in blood. Inflammation in the body tends to be accompanied by plasma proteins that cause red blood cells to aggregate more quickly than normal. Thus, a higher ESR value indicates the presence of inflammation. ESR is a diagnostic screening test for general inflammation in the body. Measuring ESR was invented almost 100 years ago by Dr. Alf Vilhelm Albertsson Westergren. He found that if a blood sample was left in a vertical pipette for an hour, at least some red blood cells would drop to the bottom of the container leaving some amount of clear plasma above. The distance from the top of the sample to a line of demarcation between red blood cells and plasma indicated inflammation—the greater the distance, the higher the ESR. The test, while time consuming, is still considered the "gold standard" for measuring ESR to screen for inflammation.

In the 1990s, scientists at Alifax's predecessor SIRE Analytical, explored new ways to speed up the test. First by using a centrifuge, which proved costly, and ultimately by pumping blood samples through a clear plastic capillary tube with light transmitted through the tube and measured by a photometer. When the pump forcing the blood through the tube was abruptly

stopped, the red blood cells aggregated, and the change in light transmitted through the sample was measured over several seconds. These scientists tested 40,000 blood samples over ten months and the lead scientist, Dr. Breda, then wrote his own software to correlate these measured results to the Westergren results.  Dr. Breda research culminated in the development of a proprietary "conversion algorithm" that converted the measurements of the blood sample to an ESR value comparable to the Westergren result.  This conversion algorithm was proprietary to Alifax.  Using Dr. Breda's conversion algorithm, Alifax's automated ESR analyzers could deliver reliable ESR values in only 20 seconds, instead of Westergren's hour.  In 2011, Alifax was the only company selling an automated ESR analyzer that could deliver results even close to 20 seconds.

In 2011, defendant Alcor was simply a distributor of existing ESR analyzers manufactured by others. It had tried in vain for more than a decade to make its own automated ESR analyzer. In the summer of 2011, frustrated by its most recent failed attempt, Alcor CEO Carlo Ruggeri located codefendant and former Alcor employee Francesco Frappa,[1] reputed to be a talented young technician, and recruited him to leave Alifax and come to work at Alcor in the United States. On the Monday of his final week of employment with Alifax, knowing he was about to join Alcor, Frappa sent emails containing proprietary Alifax research reports and data from the company to his private Gmail account. On October 31, 2011, even before finishing his employment at Alifax, he joined Alcor as its VP of Research & Development. Alcor promised to pay Mr. Frappa a 3% royalty on all sales of ESR analyzers and related products in exchange for

---

[1] In the new trial order, it was determined that the jury on retrial would not be permitted to award damages against Mr. Frappa, and this ruling was not appealed. *Alifax Holding Spa v. Alcor Sci. Inc.*, 404 F. Supp. 3d 552, 558 n. 7 (D.R.I. 2019).  Accordingly, at the upcoming trial, Alifax will only seek monetary damages against Alcor.

delivering information enabling Alcor to build its own ESR analyzer, specifically including the conversion algorithm.

Frappa came to the United States in November 2011 and immediately began to design an ESR analyzer for Alcor to compete with Alifax. By using Alifax's trade secrets, Alcor succeeded in designing and building a functioning ESR analyzer, the iSED, in only seven months, just in time to launch with great fanfare at the most important trade show for the industry, the AACC, in July 2012. Frappa programmed the prototype instrument displayed at the trade show to include the Alifax conversion algorithm.  Because the Alcor iSED copied the essential workings of the Alifax ESR analyzers, it was also able to deliver results in only 20 seconds. Alcor immediately lined up its first sales for its new device. If Alcor had missed this deadline, it would have had to wait a full year to launch its device and make any sales.

In late 2012, Frappa used a prototype iSED instrument that he had programmed with the Alifax trade secret "conversion algorithm" to carry out Alcor's own initial research on human blood samples. The results of those tests were later submitted to the FDA to show that the iSED instrument could deliver results comparable to the Westergren test. Thus, Alcor continued to benefit from its use of the stolen Alifax conversion algorithm even after it launched the iSED in July 2012.

### b.  Procedural History

Alifax initially filed this case in 2014 against both Alcor and Frappa with counts for patent infringement and trade secret misappropriation on several separate trade secrets and a count against just Frappa for breach of a confidential relationship.  Discovery slowly uncovered the extent to which Frappa had pilfered Alifax's trade secrets and other intellectual property resulting in Alifax amending its complaint to include to include copyright infringement.  During

discovery, Alifax reviewed Alcor's iSED source code and found that it contained the exact same constants as Alifax's conversion algorithm and that certain versions of the iSED software contained the conversion algorithm in toto. In March 2018, the parties cross-moved for partial summary judgment with the Court noting that it was "undisputed that Alifax's conversion algorithm and constants (an alleged trade secret) were incorporated into . . . the iSED software."

In the winter and spring of 2019, the parties began to ready the case for trial, but before that trial, the Court issued several significant evidentiary rulings.  Some of these rulings led Alifax to drop its claim for copyright infringement.  Additionally, Alcor moved that the case be bifurcated into two separate jury trials: a liability phase and subsequent damage phase. Nevertheless, Alcor clearly requested that a jury hear both phases including any trade secret damages.  The Court granted Alcor's motion and the trial was bifurcated.

The liability phase focused on patent infringement and trade secret misappropriation for several trade secrets including the conversion algorithm.  Alifax ultimately dropped its claims for patent infringement during the pendency of the liability phase.

During the liability phase, Alifax elicited testimony demonstrating that Alcor incorporated Alifax's conversion algorithm into its iSED device in May 2012, about eight weeks before the critical AACC tradeshow and the launch of the device.  After the tradeshow, in November and December of 2012, the conversion algorithm was still present in the iSED software.  Indeed, until at least January 28, 2013, the only conversion algorithm ever programmed into the iSED was Alifax's.  Additionally, without any objection, Alifax's technical expert Dr. Bergeron testified that Alcor achieved a one-year head start on sales of the iSED by incorporating the conversion algorithm into the iSED so that Alcor could show the device at the

July 2012 AACC.  Without Alifax's conversion algorithm, that device could not be described as an ESR analyzer because it could not have generated an ESR value from a blood sample.

In the liability phase, the jury was instructed about trade secrets and their misappropriation.  These instructions defined a trade secret as information that "derives independent economic value, actual or potential, from not generally being known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use" and specifically that the jury should only find a trade secret existed if "the information had economic value to Alcor and Frappa." ECF Dkt. 291 at 30.  The jury was also instructed via a separate instruction as to the exact definition of independent economic value.  *Id*. at 33.  The jury was next instructed that misappropriation included both improper acquisition of the trade secret or use of the trade secret.  *Id.* at 36.  Finally, the jury was instructed as to what "use" meant in the context of trade secret misappropriation.  *Id.* at 39. None of these instructions was challenged by Alcor.

After instructions were read and closing arguments made, the jury was asked to answer a series of special interrogatories in rendering the verdict.  Specifically, the jury was asked whether:

> Portions of computer program source code concerning the conversion of photometric measurements, including source code containing the four specific conversion constants qualified as a trade secret.  (See ECF No. 292.)

The jury unanimously answered "Yes."  Next, the jury was asked if Alcor had misappropriated that conversion algorithm trade secret.  Likewise, the jury unanimously answered "Yes." Additionally, the jury found that Frappa had misappropriated this trade secret.  Finally, the jury was asked if the misappropriation was willful and malicious.  And once again, the jury unanimously answered "Yes."  ECF Dkt. 292. Notably, Alcor did not request any special

interrogatories as to whether the conversion algorithm had independent economic value or whether Alcor used the conversion algorithm.  The verdict form applied the total definition of "trade secret" and "misappropriation" thereby encompassing the entirety of the detailed instructions. The case then proceeded to the damages phase.

The evening before the start of the damages jury trial, Alcor filed "Defendants' Memorandum on Damages Issues" discussing the Court's intention to apply a burden shifting framework for determining unjust enrichment after identifying this measure as one of three acceptable damages standards under the RIUTSA. (ECF Dkt. 287.)  In that memorandum, Alcor does not object to the jury hearing unjust enrichment; how could it given that it was Alcor who requested the bifurcated jury trial?  Moreover, in this memorandum, Alcor specifically reiterated its request that the jury determine the unjust enrichment damages explaining Section 6-41-3 of the RIUTSA requires a jury to hear the issue:

> [s]ubject to any limiting instructions from the court, the jury determines the amount of any damages award under the Rhode Island Uniform Trade Secret Act; the Court's equitable role in assessing whether the "monetary recovery is inequitable" comes after the jury returns with the damages award. R.I. Gen Laws 6-41-3.

Thus, before the damages phase started, Alcor properly requested and assented to a jury verdict on the unjust enrichment damages.  Simply put, Alcor received exactly what it requested.  Only now does it seek to upend the case by claiming a jury should not hear damages through a motion where it illogically seeks to strike its own previous request for a jury to hear damages.  While it is certainly proper for the jury to decide damages (as set forth in detail in Alifax's opposition to motion to strike the jury), more importantly, Alcor *waived any argument that a jury should not hear the trade secret damages*—a waiver that carries to this day.

8

The Court also determined that it was proper to use the burden shifting framework for calculating the unjust enrichment Alcor received by garnering the one-year head start. Alifax thus only had to put forth the revenue resulting from the head start with Alcor then having to show deductible expenses. Setting forth the head start revenue was (and remains) a straight-forward task, especially in view of Alcor's own financial spreadsheet—a simple calculation reveals the amount of revenue related to the iSED. The Court further decided that Alifax's damages expert, Chris Bokhart, could not opine as to the extent of unjust enrichment, but could provide summary testimony about that financial spreadsheet. After conducting the damages trial, the jury found Alcor liable for $6.5 million in unjust enrichment damages. In a series of post-trial rulings, the Court threw out the conversion algorithm liability verdict, ordered a new trial, and barred Alifax from putting forth any damages evidence. The Federal Circuit reversed these findings, reinstated the willful and malicious verdict and ordered a new trial on damages.

## III.  Applicable Law

In the November 7, 2024 Text Order, the Court ordered the parties to file a joint motion and individual supporting memoranda on various legal and procedural questions concerning the scope of the upcoming trial. Much of the applicable law has already been set forth in Alifax's memoranda pursuant to the November 7 Order. *See* ECF Dkt. 383 and 385. Thus, in this space, Alifax will briefly address the law governing the damages it is entitled to, and the legal basis for why this damages trial should be limited in its scope and not be used as a forum for Alcor to relitigate matters that are the law of the case or that it waived during the initial trial. Alifax has already responded in detail as to why a jury should determine the damage amount and how Alcor waived any request to strike the jury.

9

As a result of Alcor's misappropriation of the conversion algorithm trade secret, Alifax is entitled to compensatory damages equal to Alcor's "unjust enrichment caused by misappropriation." R.I. Gen. Laws Ann § 6-41-3(a) (West 2014).   Judge Smith instructed the jury before the damages phase in the initial trial in accordance with Restatement (Third) of Unfair Competition § 45, cmt. f, which puts the initial burden on plaintiff of proving gross sales and then "appropriately shifts the burden to the party [defendant] that is in possession of the information that can; it might not otherwise be accessible to the plaintiff to apportion out those profits and to show why they should be reduced or discounted." Trial Tr., May 1, 2019, Volume 11 at 32:14-20.  The Court's cited cases in support remain good law. *See, e.g., Lockheed Martin Corp. v. L-3 Commc'ns Integrated Sys., L.P*., No. 1:05-CV-902-CAP, 2009 WL 8435667, at *3 (N.D. Ga. Apr. 9, 2009) ("[T]he Restatement (Third) of Unfair Competition states that in a trade secret case, 'the plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.'"); *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 175, 385 N.E.2d 1349, 1359 (1979) ("Once the plaintiffs demonstrate that the defendants have made profits from sales of products incorporating the misappropriated trade secrets, the burden shifts to the defendants to demonstrate the portion of their profits which is not attributable to the trade secrets.")  Alifax cited to additional authorities in support of this approach in its recent trial issues briefing.  ECF Dkt. 385 at 13-14.

Since the first trial in 2019, the First Circuit has also explicitly approved the theory of head start damages for unjust enrichment in cases like the present one, *citing this case as an example*. *See BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 345–46 (1st Cir. 2024). In its December 16, 2024 reply memorandum, Alcor sought to distinguish *BioPoint* on the ground that "this is an

acquisition case, not a use case." ECF Dkt. 384 at 16.  It cited to language from *BioPoint* whereby "the 'head start rule has no application' in a case in which the 'trade secret . . . has never appeared in any marketed product or otherwise lawfully been made publicly accessible.'" ECF Dkt. 384 at 17.  However, as discussed in its trial briefs, Alcor's position wholly ignores the law of the case whereby Judge Smith made clear that Alcor's conduct both in acquiring and using the trade secret were within the scope of damages.  ECF Dkt. 383 at 9-10; ECF Dkt. 385 at 11-13.

The Court's pre-damages-phase ruling of law on how to calculate damages for unjust enrichment was not challenged or reversed on appeal, so it remains the law of the case.  Under the law of the case doctrine, legal decisions made by a court at a particular stage of proceedings "govern the same issues in subsequent stages of the same litigation, unless corrected by appellate review." *McConaghy v. Sequa Corp.*, 294 F. Supp. 2d 151, 160 (D.R.I. 2003). This rule also "applies to all legal determinations made at the same level of proceedings, regardless of whether the rulings were made by a predecessor judge." *Id.*  The new damages trial is not a "redo" on liability because the reinstated liability phase of the trial and its consequent verdict is the "law of the case." *See, e.g., Navelski v. International Paper Co.,* 261 F.Supp.3d 1212, 1219 (N.D. Fla. 2017) ("Importantly, the liability jury's factual finding with respect to causation will become the law of the case and thus will be removed from consideration by subsequent juries.").

Moreover, because Alcor was already found liable for misappropriating Alifax's conversion algorithm, it is conclusively established that the conversion algorithm is a trade secret and that it had economic value.  R.I. Gen. Laws Ann. § 6-41-1(2), (4) (West). It is also now an established fact that Alcor willfully and maliciously misappropriated that trade secret. *Id.* § 6-41-3(b).  In the liability phase, Alifax established that Alcor needed (and used) the conversion

11

algorithm to build an iSED device in time to launch the product at the critical 2012 AACC tradeshow. Without misappropriating the conversion algorithm, Alcor would have been forced to waitanother year to launch the iSED, just as it had when it missed the deadline for the 2011 AACC tradeshow. Thus, Alcor's misappropriation of the conversion algorithm "moved up" sales of the iSED and its required supplies—and consequently Alcor's revenue and profits—by an entire year.

Using this one-year head start, Alcor gained at least an extra $13 million dollars in revenue between 2012 to September 2018, the last date of financial information provided by Alcor. Using Alcor's own financial spreadsheet that is a business record and admitted previously without objection, the amount of Alcor's revenue due to iSED sales and sales of necessary iSED supplies such as test cards, is plain:

| | FY 2011 Actual | FY 2012 Actual | FY 2013 Actual | FY 2014 Actual | FY 2015 Actual | FY 2016 Actual | FY 2017 Actual | YTD 9/30/18 Actual |
|---|---|---|---|---|---|---|---|---|
| 4000 · SALES | | | | | | | | |
| # of Pumps | 3,536 | 9,441 | 17,623 | 6,048 | 4,631 | 4,005 | 2,979 | 2,209 |
| 4110 · Pumps | 742,522 | 2,060,536 | 4,773,980 | 2,212,533 | 1,551,200 | 1,388,845 | 915,526 | 543,747 |
| 4115 · Pump Rental | 33,134 | 29,742 | 190,980 | - | - | | | - |
| 4150 · Enteral Sets | 779,472 | 991,163 | 794,535 | 802,722 | 957,498 | 362,022 | 156,107 | 260,857 |
| 4190 · Enteral Service | 49,224 | 48,971 | 115,718 | 48,304 | 99,296 | 65,961 | 89,864 | 60,435 |
| 4195 · Contractual Fees | - | 215,833 | 370,000 | 370,000 | 370,000 | 320,000 | 554,167 | 175,000 |
| Total 4100 · Sales - Enteral | 1,604,352 | 3,346,245 | 6,245,213 | 3,433,559 | 2,977,994 | 2,136,828 | 1,715,663 | 1,040,039 |
| 4200 · Sales - Diagnostic | | | | | | | | |
| # of Analyzers | 0 | 3 | 48 | 159 | 309 | 398 | 437 | 309 |
| 4210 · iSED, MIZAR, picoSED | - | 54,500 | 256,977 | 751,675 | 1,548,838 | 2,453,208 | 1,871,116 | 1,639,235 |
| 4251 · Test Cards | - | - | 160,860 | 612,379 | 2,080,642 | 2,887,048 | 4,561,080 | 4,480,560 |
| 4252 · ESR Distributed (ves,sedifast) | 1,201,259 | 1,164,907 | 1,007,269 | 743,632 | 509,841 | 300,256 | 38,593 | 6,271 |
| 4253 · Controls | 224,797 | 325,999 | 310,087 | 459,401 | 1,032,227 | 1,635,697 | 2,737,147 | 3,178,122 |
| 4254 · Accessories | 4,675 | 13,565 | 16,867 | 77,448 | 264,029 | 490,670 | 942,487 | 975,094 |
| 4290 · Diagnostic Service | 67,244 | 63,831 | 32,975 | 31,716 | 275,155 | 411,221 | 614,224 | 615,652 |
| Total 4200 · Sales - Diagnostic | 1,497,975 | 1,622,802 | 1,785,034 | 2,676,251 | 5,710,732 | 8,178,099 | 10,764,647 | 10,894,935 |

The amount of both head start revenue and related profits are easily calculated via simple arithmetic from this spreadsheet. (The financial spreadsheet is Alcor's business record so it is self-authenticating and not hearsay.)

Alifax claims as its compensatory damages the defendants' "unjust enrichment caused by misappropriation," in accordance with R.I. Gen. Laws Ann § 6-41-3(a) (West 2014).  As the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") explains the parties' respective burdens: "A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least as reasonable approximation of the amount of the wrongful gain.  Residual risk of uncertainty in calculating net profit is assigned to the defendant."  Restatement § 51(5)(d).  "This means that the defendant bears the burden of establishing the appropriate deductions from gross revenues to calculate net profits, and the parallel burden of establishing the portion of such profits that is derived from elements other than the defendant's wrongdoing."  *Id.* § 42, cmt. h.

Here, the extent of Alcor's unjust enrichment is equal to all the extra profit it has gained from a one-year head start in launching the iSED device.  According to its own promotional literature, Alcor's internal records show that as of 2025, 48 million ESR tests are conducted annually.  The evidence will show that Alcor gets paid for every one of those tests.

As the district court concluded, a 'year-long delay is one outcome that may be reasonably inferred from the trial evidence." ECF Dkt 348 at 51.  As the district court also determined, the calculation of Alcor's profit from its head start is a matter of simple arithmetic using Alcor's own financial data.  *Id.* at 50.  The financial data is contained in Trial Exhibit 173 that was admitted without objection.  Trial Transcript, vol. 11 at 64:5-9.  As this Court observed during trial, Alifax could introduce this spreadsheet through Alcor's CEO.  *Id.*at 10:9-10.

Based on that spreadsheet and nothing else, Alcor's overall gross profit margin is 78% with net profit at 44%.  Again, both are easily calculable with simple arithmetic.  Additionally, given the many years that have elapsed since Alcor last updated its financial disclosures, it is

expected that both iSED sales and revenue for related products such as necessary test cards has increased because: (1) the installed base of iSED analyzers increases with every new sale while previous installed devices remain in service and (2) the extremely profitable sale of related products, such as test cards, also increases for both new iSEDs and also iSEDs that have been in the field for years.

Alifax anticipates that Alcor will seek to undo the liability phase at every turn. For example, in its argument on trial issue 11, Alcor is seeking to limit Alifax's ability to seek head start damages at all.  ECF Dkt. 384 at 15-17; ECF Dkt. 382 at 18-19. This is precisely what Alcor did after the first trial and what the Federal Circuit reversed on appeal. Evidence supporting the one-year head start damages theory was introduced by Alifax's technical expert Dr. Bergeron during *the liability phase* and *without any objection by Alcor*. If a party failed to object to evidence presented during the original trial, it should not be permitted to raise objections to the same evidence on retrial. *See, e.g.*, *Mondis Tech. Ltd. v. LG Elecs., Inc.*, No. CV 15-4431 (SRC), 2023 WL 145528, at *5 (D.N.J. Jan. 10, 2023) (holding that defendant could not, at the retrial, object to expert witness's opinion as it "failed to object to the testimony at trial" and thus "waived this objection").

Alifax also anticipates that Alcor intends to argue that it did not use the conversion algorithm and that the algorithm had no value to Alcor.  While both of these arguments are contradicted by testimony during liability phase, more importantly, these anticipated arguments contradict the very liability verdict that the Federal Circuit reinstated.  Therefore, it is law of the case that the conversion algorithm has independent economic value to Alcor and Alcor used the algorithm.  Simply put, these findings are unassailable.

14

The verdict form required that to find trade secret misappropriation, the jury first had to decide whether the conversion algorithm was a trade secret and if it was a trade secret, did Alcor misappropriate it.  The jury answered "Yes" to both questions.  Moreover, before reaching that verdict, the jury was explicitly instructed that in order for the conversion algorithm to be a trade secret, it must have independent economic value to Alcor and in order to find misappropriation, Alcor had to acquire and/or use the conversion algorithm.  Therefore, by answering "Yes" to the question of whether the conversion algorithm was a trade secret, the jury determined that it had economic value and by answering "Yes" to the misappropriation question, the jury determined that Alcor used the conversion algorithm.

A verdict form should be read in conjunction with the jury instructions that accompanied that form into the jury room.  *See, e.g., BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 353-54 (1st Cir. 2024)(" Considered with the jury instructions, the verdict form adequately presented the issues to the jury.").  Here the instructions explicitly called out that in order for the conversion algorithm to be a trade secret it had to have independent economic value and that misappropriation constituted use and/or acquisition.  ECF Dkt. 291 at 30, 33, 36. Moreover, the verdict form did not differentiate between use or acquisition—it only required the jury to find "misappropriation" which included use.   ECF Dkt. 292. Under these circumstances and, particularly where Alcor did not request any special verdict form on these issues—independent economic value and use—there are no grounds for revisiting the finding of trade secret liability. *See, e.g., Equate Media, Inc. v. Suthar,* No. 22-55681, 2023 U.S. App. LEXIS 29486, at *3-4 (9th Cir. Nov. 6, 2023) ("Although the defendants also challenge the validity of the Katz companies' other putative trade secrets, they did not seek a special verdict or otherwise ask the jury to apportion damages among the various trade-secret theories.").

15

In sum, Alifax will again present evidence of unjust enrichment based on a head start theory, including exhibits such as Trial Exhibit 173 (an Alcor profit and loss spreadsheet) that the Federal Circuit cited in its opinion and was previously admitted at trial, again *without objection*. 2024 WL 2932910, at *9. The unjust enrichment from Alcor's head start has presumably increased as Alcor never stopped selling the iSED device or its required accessories. Thus, to the extent the information in Trial Exhibit 173 is supplemented, as Alifax has requested, Alifax will also present that evidence at trial. That said, Alifax will introduce Exhibit 173 again, demonstrating one very conservative calculation of head start revenue solely from that simple exhibit.

Additionally, it is law of the case that the conversion algorithm is a trade secret, thereby having independent economic value to Alcor, and that Alcor misappropriated the conversion algorithm trade secret, thereby demonstrating Alcor used the algorithm. Both value and use were decided by the jury in reaching its liability verdict—a verdict reinstated by the Federal Circuit. To allow, Alcor to attack these findings in the upcoming damages trial not only violates the doctrine of "law of the case" but would up end the Federal Circuit's mandate. *See McConaghy, supra,* 294 F. Supp. 2d at 160 (under this doctrine, legal decisions made by a court at a particular stage of proceedings "govern the same issues in subsequent stages of the same litigation, unless corrected by appellate review."); *Navelski, supra*, 261 F.Supp.3d at 1219 ("Importantly, the liability jury's factual finding with respect to causation will become the law of the case and thus will be removed from consideration by subsequent juries.").

Once the jury determines an ultimate damages number, due to the willful and malicious finding, under the Rhode Island Uniform Trade Secret Act, the Court has discretion to double the award and award attorney fees. Alifax is also entitled to prejudgment interest under the Rhode

16

Island statutory rate, which is calculated as simple interest starting from the date the cause of action accrued. *Cochard v. Roehm Prod. of Am., Inc.*, No. 1:18-CV-00301, 2023 WL 1433092, at *9 (D.R.I. Feb. 1, 2023).

## IV.    Identification of any Evidentiary Issues That May Arise

Several of the issues the parties briefed pursuant to the November 7, 2024 Text Order touched on evidentiary issues that may arise at trial, including the following:

- **Issue 4 –** whether parties may designate and introduce testimony from the liability phase to provide context;

- **Issue 9 –** whether Alifax is required to apportion damages and is precluded from offering evidence on the total revenues relating to the iSED;

- **Issue 10 –** whether Alifax is precluded from offering evidence on non-iSED products/convoyed products (e.g., test cards);

- **Issue 11 –** whether Alifax is precluded from offering evidence supporting a theory of head start damages;

- **Issue 12 –** whether Alifax is precluded from referring to the Clinical Laboratory Improvement Amendments (CLIA) designation as a basis for damages.

Other evidentiary issues that may arise (and may be the subject of motions in *limine*) include the following:

- Alcor should not be permitted to question the verdict in the initial case that found Alcor engaged in willful and malicious misappropriation of Alifax's conversion algorithm trade secret, or otherwise re-litigate matters that are the law of the case including whether Alcor actually used the stolen conversion algorithm (it did);

17

- The scope of permissible testimony by Alcor expert Ronen Arad should be limited to opinions expressed in his expert report.

- Alcor should be prohibited from raising any withdrawn, unasserted or dismissed defenses.

By listing the foregoing, Alifax does not waive its ability to file any additional motions *in limine* or make any evidentiary objections during the course of the trial.

## V.    Statement as to Probable Length of Trial

Plaintiff estimates this case can be tried to a jury in no more than four days (including jury selection and opening and closing arguments).

## VI.    Plaintiff's Witnesses

Alifax's potential trial witnesses (excluding rebuttal witnesses) are:

1.    Bryan Bergeron, M.D. (in person)

2.    Paolo Galiano, Ph.D. (in person)

3.    Manuela Rossetto (in person)

4.    Francesco A. Frappa (adverse) (by deposition and/or reading in trial testimony)

5.    Carlo Ruggeri (adverse) (by deposition and/or reading in trial testimony)

6.    Karla Ruggeri (adverse) (in person)

7.    Peter Sacchetti (adverse) (by deposition and/or reading in trial testimony)

8.    Giovanni Battista Duic (in person)

9.    Jim Post (in person)

10.    Aaron Erlandson (in person)

## VII.    Plaintiff's Exhibits

A list of Alifax's potential trial exhibits (not including rebuttal exhibits and demonstrative exhibits) is attached hereto as Exhibit A. Alifax reserves the right to supplement this list upon timely notice to defendants and to incorporate by reference any exhibits identified by defendants.

## VIII.   Plaintiff's Voir Dire

Alifax's proposed voir dire questions are attached as Exhibit B.

## IX.   Plaintiff's Proposed Jury Instructions

As this Court is aware, Alcor has moved to strike Alifax's jury trial demand.  ECF 376.  As discussed in Alifax's memorandum in opposition, Alcor's motion lacks merit for several reasons, not least of which is the fact that Alcor itself requested a jury trial on damages in advance of the original trial in this matter.  ECF Dkt. 378.  Moreover, on remand, the Federal Circuit mandated that a new trial occur without ruling that such trial should be a bench trial.  Thus, Alifax continues to maintain that a jury should be empaneled to consider damages in this case.  To that end, Alifax's initial proposed preliminary jury instructions are attached hereto as Exhibit C and concluding instructions are attached as Exhibit D. Alifax reserves the right to provide modified or supplemental instructions in view of any rulings by the Court on motions *in limine* or the trial issues briefed pursuant to the Court's November 7, 2024 Text Order that touch on the content of eventual jury instructions such as issue nos. 2, 3, 6 and 8.  *See* Joint Motion at ECF Dkt. 381.  And, as to the concluding jury instructions, Alifax also reserves the right to provide modified or supplemental instructions based on the evidence presented at trial.

Date: January 17, 2025

Respectfully submitted,

*/s/Joshua A. Friedman*
Michael J. Daly (#6729)
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
Tel: (401) 588-5113
Fax: (401) 588-5166

Todd R. Tucker (*Admitted Pro Hac Vice*)
ttucker@calfee.com
Joshua A. Friedman (*Admitted Pro Hac Vice*)
jfriedman@calfee.com
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
Tel: (216) 622-8200
Fax: (216) 241-0816

*Attorneys for Plaintiff Alifax Holding S.p.A.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the ECF system on the 17th day of January 2025 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

> /s/Joshua A. Friedman
> One of the Attorneys for Plaintiff